1
2
3
4
5
6
7
8                         UNITED STATES DISTRICT COURT

9                       SOUTHERN DISTRICT OF CALIFORNIA

10    JUSTIN HOWARD                          Civil No.    10cv2535-AJB(RBB)

11                              Plaintiff,   **ORDER GRANTING IN PART AND**
                                             **DENYING IN PART DEFENDANTS'**
12               v.                          **MOTION FOR SUMMARY**
                                             **JUDGMENT; RESCHEDULING**
13    BYRON HIBSHMAN; SIAVASH                **PRETRIAL CONFERENCE**
      PAZARGADI; CITY OF SAN DIEGO; DOES
14    I-X,                                    **[Doc. No. 33.]**

15                             Defendants.

16          Before the Court is Defendants Officer Byron Hibshman, Siavash Pazargadi, and the City of

17    San Diego's motion for summary judgment.  Plaintiff Justin Howard filed an opposition on March 2,

18    2012.  Defendants filed a reply on March 9, 2012.  A hearing was held on June 22, 2012.  Iwo

19    Ostoja, Esq. appeared on behalf of Plaintiff and John Riley, Esq. appeared on behalf of Defendants.

20    After a thorough review of the briefs, supporting documentation, applicable law, and hearing oral

21    argument, the Court GRANTS in part and DENIES in part Defendants' motion for summary

22    judgment.

23                                **Procedural Background**

24          On December 10, 2010, Plaintiff Justin Howard filed a 42 U.S.C. § 1983 civil rights

25    complaint against Defendants Officer Byron Hibshman, Senior Traffic Engineer Siavash Pazargadi

26    and the City of San Diego.  (Dkt. No. 1.)  Defendants Hibshman and the City of San Diego filed an

27    answer on March 4, 2011.  (Dkt. No. 8.)  On April 15, 2011, Defendant Pazargadi filed an answer.

28    (Dkt. No. 13.)  On August 4, 2011, the Court granted Plaintiff's motion for leave to file a first

amended complaint.  (Dkt. No. 22.)  On August 23, 2011, Plaintiff filed a first amended complaint. (Dkt. No. 23.)  Plaintiff asserts ten causes of action:

1. First Cause of Action -Violations of the First, Fifth and Fourteenth Amendments to the United States Constitution against all Defendants;

2. Second Cause of Action - Conspiracy to Violate Federal Rights against Defendants Hibshman and Pazargadi;

3. Third Cause of Action - False Imprisonment against Defendants Hibshman and the City of San Diego;

4. Fourth Cause of Action - Racial Discrimination against Defendants Hibshman and the City of San Diego;

5. Fifth Cause of Action - Slander against Defendant Hibshman;

6. Sixth Cause of Action - Violation of California Civil Code § 52.1 against Defendant Hibshman;

7. Seventh Cause of Action - Violation of California Civil Code § 52.1 against Defendant Pazargadi;

8. Eighth Cause of Action - Malicious Prosecution against Defendant Hibshman;

9 Ninth Cause of Action  - Intentional Infliction of Emotional Distress against Defendants Hibshman and Pazargadi;

10. Tenth Cause of Action - Negligent Infliction of Emotional Distress Against Defendants Hibshman and Pazargadi.

On September 8, 2011, Defendants filed an answer to the first amended complaint.  (Dkt. No. 24.)  On January 12, 2012, Defendants filed a motion for summary judgment.  (Dkt. No. 33.) Plaintiff filed an opposition on March 2, 2012.  (Dkt. No. 40.)  Defendants filed a reply on March 9, 2012.  (Dkt. No. 49.)  On April 25, 2012, the Court set a briefing schedule requiring the parties to address whether the amended Pedicab Ordinance that became effective on October 11, 2009 is retroactive or not.  (Dkt. No. 51.)  On May 5, 2012, Defendants filed a supplemental brief.  (Dkt. No. 52.)  On May 14, 2012, Plaintiff filed his response.  (Dkt. No. 53.)

/ / / /

[10cv2535-AJB(RBB)]

**A.** **Defendants' Facts**

**1.** **March 18, 2010 Incident**

On March 18, 2010, around 2:55 p.m., Defendant Officer Hibshman saw Plaintiff in a pedicab stopped in front of the train station on Kettner Boulevard in San Diego.  (Dkt. No. 33-12, Ds' Exs., Hibshman Decl. ¶ 2.)  Based on the yellow color of the permit, Hibshman determined that Plaintiff's permit had expired.  (Id.)  The 2009 permits were yellow and the 2010 permits were red.  (Id.)  Hibshman wrote a citation for violation of San Diego Municipal Code section 81.0103 - Permit Requirement to Operate Pedicab.[1]  (Id. ¶ 3.)  Hibshman noticed that Plaintiff was becoming upset and rather than exacerbate the situation, he did not confiscate the invalid permit.  (Id. ¶ 4.)  He told Plaintiff to return the leased pedicab to the owner's warehouse and not to drive a pedicab until he obtained a current permit.  (Id.)

After receiving the citation, Plaintiff pulled away from the curb on Kettner Boulevard.  (Id. ¶ 5.)  Hibshman noticed that Plaintiff had a red signal light for his direction of travel but he did not stop at the limit line but instead pedaled across the limit line as he approached the trolley tracks where a nearby trolley was approaching from the southwest direction.  (Id.)  Plaintiff continued pedaling his pedicab towards the trolley tracks and the trolley driver had to slow the trolley because of Plaintiff's approach to the tracks.  (Id.)  The trolley driver sounded the horn at Plaintiff to gain his attention.  (Id.)  During this time, Plaintiff was agitated and continued yelling something to the effect that the law did not apply to him.  (Id.)

After the trolley passed, Plaintiff crossed through a red signal light, proceeded through the intersection turning right, heading west on Broadway toward Harbor Drive.  (Id. ¶ 6.)  Because of his vehicle code violation, Hibshman proceeded to follow Plaintiff in his motorcycle intending to stop Plaintiff and cite him for violating the traffic law.  (Id.)  Hibshman called for backup because of Plaintiff's continued agitation and yelling.  (Id.)

Hibshman yelled and signaled at Plaintiff to stop his pedicab but he refused.  (Id. ¶ 7.)  While

---

[1]Section 83.0103(a) provides, "[i]t is unlawful for any *person* to operate a *pedicab* within the City without having a valid *operating permit* issued by the City pursuant to this Division."  (Dkt. No. 52-4, Ds' Ex. 28 at 5.)

1   on West Broadway, between Kettner and Harbor Drive, Hibshman tried three times to put his

2   marked police motorcycle in front of Plaintiff in order to force him to stop.  (Id.)  On each attempt,

3   Plaintiff swerved around his motorcycle and avoided stopping.  (Id.)  On the same stretch of West

4   Broadway, Hibshman saw a marked San Diego Police car try two times to pull over Plaintiff.  (Id.)

5   Plaintiff swerved around the patrol car both times and at one point crossed the double yellow line

6   and cones that delineate the east and west bound traffic on West Broadway.  (Id.)  He crossed into

7   oncoming traffic traveling east and then crossed back into the westbound traffic to continue towards

8   Harbor Drive.  (Id.)

9           The SDPD officers in the car activated their lights and siren and followed Plaintiff through

10   the intersection of West Broadway and Harbor Drive onto the west of Harbor Drive where Plaintiff

11   struck a stopped patrol car.  (Id. ¶ 8.)  Police officers used minimal force to overcome Plaintiff's

12   resistance lowering him to the ground to handcuff him.  (Id.)  Hibshman never touched Plaintiff

13   during the initial stop for the invalid permit and did not touch him during the arrest after the stop on

14   West Broadway and Harbor Drive.  (Id.)

15           Upon information and belief, Plaintiff was arrested for reckless driving and failure to obey a

16   traffic officer.  (Id. ¶ 9.)  In addition to the citation for operating a pedicab without a valid permit,

17   Plaintiff was charged with resisting arrest in violation of California Penal Code section 148(a)(1);

18   unlicensed driving in violation of California Vehicle Code section 12500(a) and reckless driving in

19   violation of California Vehicle Code section 23103(a).  (Id.; Dkt. No. 33-14, Ds' Ex. 4.)

20           On May 5, 2010, the citation of operating a pedicab without a valid permit was dismissed as

21   part of a negotiated settlement whereby nine sets of charges, representing a long history of

22   outstanding violations, were "packaged" and civil assessments were imposed totaling over

23   $1050.00.  (Dkt. No. 33-15, Ds' Ex. 5.)  On January 14, 2011, a negotiated plea and settlement

24   resulted in a dismissal of the remaining charges against Plaintiff in exchange for two days of public

25   service work.  (Dkt. No. 33-14, Ds' Ex. 4.)

26           **2.      Permit Revocation and Administrative Hearing**

27           On April 1, 2010, thirteen days after his arrest, Plaintiff applied for a new operating permit at

28   the City's Transportation Engineering Division, Engineering and Capital Projects Department

("TED").  (Dkt. No. 33-16, Ds' Ex. 6.)  When he applied, Plaintiff failed to state that there were pending Vehicle Code violations against him.  (<u>Id.</u>)

On the next day, April 2, 2010, TED became aware of the Vehicle Code violations and sent a letter of suspension by Certified Mail, signed by Defendant Sivash Pazargadi to Plaintiff.  (Dkt. No. 33-17, Ds' Ex. 7, Pazargadi Decl. ¶¶ 3, 10, )  The letter advised Plaintiff that his pedicab permit was suspended and that he had 10 days to appeal the suspension.  (<u>Id.</u>)  The letter was returned "not deliverable" to TED.  (<u>Id.</u>, Ds' Ex. 8.)  Pazargadi states that had Plaintiff fully and truthfully disclosed the material fact that he had Vehicle Code violations related to the unsafe operation of a pedicab pending at the time of his application, it would have been denied.  (Dkt. No. 33-17, Ds. Ex. 7, Pazargadi Decl. ¶ 6.)

On August 12, 2010, Plaintiff appeared at an administrative hearing, waiving any notice defects in the newly scheduled hearing.  (Dkt. No. 33-19, Ds' Ex. 9.)  The hearing officer determined that pursuant to San Diego Municipal Code section 83.0127(a)(5), the City's April 2, 2010 suspension of Plaintiff's permit was proper.  (<u>Id.</u>)  Plaintiff did not appeal the administrative ruling.

Sometime after the revocation of Plaintiff's pedicab permit, Officer Thompson seized Plaintiff's revoked permit issued on April 1, 2010.  (Dkt. No. 33-10, Howard Depo., 192:25-194:25.)

**B.    Plaintiff's Facts**

      **1.    Background to March 18, 2010 Incident**

According to Plaintiff, from 2004 to April 2010, he has been operating pedicabs in downtown San Diego with valid permits.  (Dkt. No. 47, Howard Decl. ¶ 1.)  He has known Defendant Byron Hibshman and Officer Scott Thompson, Hibshman's partner, since 2004.  (<u>Id.</u>)  He has rented his pedicab from Alley Cabs since 2007.  (<u>Id.</u>)

Since 2006, Plaintiff has been active on pedicab issues before the City Council.  (<u>Id.</u> ¶ 2.)  He considers himself a "bicycle rights activist."  (<u>Id.</u>)  He has spoken on pedicab issues during at least fourteen City Council meetings.  (<u>Id.</u>)  He has also contacted City Council members and City bureaucrats about illegal and arbitrary stops by police officers, selective enforcement of laws against operators from other pedicab companies, and amendments to the municipal code that would not help

1   the pedicab industry.  (<u>Id.</u>)  He has also distributed leaflets under the pen name, Triple Wagon

2   Express.  (<u>Id.</u>)  Plaintiff's proposals were contrary to the amendments restricting pedicabs proposed

3   by Defendant Hibshman and Scott Thompson.  (<u>Id.</u>)  Hisbhman and Thompson were involved in

4   drafting the 2010 pedicab ordinance amendments.  (<u>Id.</u>)

5        Plaintiff claims that as a result of Plaintiff's involvement on these pedicab issues, Officers

6   Hibshman, Thompson and other officers would harass Plaintiff, stop him for no reason, and scare off

7   customers.  (<u>Id.</u>)  In 2008, his permit was stolen by cops for three months.  (<u>Id.</u>)

8        On January 13, 2010, Plaintiff submitted a complaint with the Citizen's Review Board on

9   Police Practice against Officer Thompson for harassing pedicab operators.  (<u>Id.</u> ¶ 3.)  Plaintiff states

10  that the complaint angered Thompson.  (<u>Id.</u>)  As a result, Defendant Hibshman and other officers

11  retaliated against him on March 18, 2010.  (<u>Id.</u>)

12        **2.       March 18, 2010 Incident**

13       Plaintiff states that on March 18, 2010, around 2:45 p.m., he was operating a pedicab

14  southbound on Kettner Boulevard by the train station.  (<u>Id.</u> ¶ 3.)  He had his operating permit #115,

15  which was valid until April 30, 2010, properly displayed.  (<u>Id.</u>)  At that time, about 60% of pedicab

16  operators were using the yellow permits.  (<u>Id.</u>)  Defendant Hibshman drove up right in front of

17  Plaintiff and gave him a citation for not having a valid operating permit.  (<u>Id.</u>)  After Plaintiff signed

18  the citation, Hibshman asked to see Plaintiff's permit and requested that he call the owner of his

19  pedicab.  (<u>Id.</u>)  Plaintiff told Hibshman he had a valid permit and business tax certificate and that he

20  will operate the pedicab himself.  (<u>Id.</u>)  Hibshman did not respond.  (<u>Id.</u>)

21       Plaintiff continued to slowly operate the pedicab southbound on Kettner.  (<u>Id.</u> ¶ 4.)  His

22  pedicab rolled past the limit line but stopped at a distance 323 feet from the trolley tracks crossing

23  Kettner.  (<u>Id.</u>)  When he stopped, a trolley was crossing Broadway and honked like it frequently does

24  when approaching this busy area.  (<u>Id.</u>)  After the trolley passed, seeing a green light, and Hibshman

25  not saying anything, Plaintiff made a right turn onto Broadway.  (<u>Id.</u>)  Hibshman then drove up to

26  Plaintiff and on three occasions, he drove into the front wheel of the pedicab in order to cause a

27  collision.  (<u>Id.</u>)  Each time, Plaintiff swerved to the side to avoid a collision.  (<u>Id.</u>)  Hibshman never

28  told Plaintiff to stop and Plaintiff was afraid for his safety, so he kept pedaling to the ferry landing

where there would be witnesses who would deter Hibshman from trying to hurt him.  (Id.)  Two patrol cars also tried to crash into Plaintiff's pedicab but he managed to avoid them by making sharp swerves.  (Id.)  During this time, nobody told him to stop.  (Id.)  When he got to the ferry landing, he got off the pedicab, raised his hand and said jokingly to some passersby "Folks, how about a ride?" (Id.)  The police ran to him, tackled him to the ground and handcuffed him face down.  (Id.)  Hibsman approached Plaintiff and took off his permit and said, "Now we got you.  Your pedicab career is over.  You're done pedicabbing.  You'll never pedicab here in San Diego again."  (Id.)  Plaintiff responded, "You never know . . . ."  (Id.)  Hibshman then held the permit in the air as a trophy piece, in order to brag to the other pedicab riders and bike owners that Plaintiff was done pedicabbing.  (Id.)

Plaintiff was taken to county jail and not given a bed until 3:00 a.m.  (Id.)  He was in jail from March 18, 2010 until March 22, 2010 without a hearing or attorney.  (Id.)  Around March 23, 2010, Plaintiff complained about Hibshman's conduct to the Citizen's Review Board on Police Practice who referred him to Internal Affairs.  (Id. ¶ 5.)

After the police took his permit, Plaintiff decided to apply for another one since his permit would expire in another month.  (Id.)  On April 1, 2010, Plaintiff went to Transportation and Engineering Division, paid money and got a new permit.  (Id.)  He went back to operating pedicabs. (Id.)  On April 2, 2010, he went to speak at a City Council meeting.  (Id.)  The next day, Thompson asked to see his permit and after seeing his permit, he said, "I can't believe they gave the permit back to you."  (Id.)  On April 24, 2010, Hibshman and Thompson approached Plaintiff and stole the new operating permit without giving him a citation.  (Id. ¶ 6.)

### 3.      Criminal Proceedings

Two criminal proceedings were initiated against Plaintiff.  One was a May 5, 2010 arraignment hearing on the citation for an invalid permit.  When he appeared and showed the judge his citation, a copy of his permit and receipts, the judge said "this doesn't make any sense" and ordered dismissal of the case.  (Id. ¶ 7[2].)  The judge then looked up his court records and noticed there were 10 pedicab citations over 6 years given to him where he failed to appear.  (Id.)

---

[2]Paragraph 7 is mistakenly numbered as 6.  (Dkt. No. 47 at 5, line 24.)

1   Therefore, the judge ordered civil assessments to be imposed but Plaintiff has not paid any of the

2   assessments.  (Id.)

3         As to the misdemeanor case charging him with violations of three statutory provisions,

4   Plaintiff  states that the City offered to dismiss the case for two days of public work and no fines;

5   however, Plaintiff refused the deal and appeared for a trial readiness hearing on January 14, 2011.

6   (Id.)  Trial was set for February 23, 2011.  (Id.)  He appeared on the trial date and the City Attorney

7   discussed a new plea bargain offer to some minor infraction.  (Id.)  While he was considering the

8   offer, the judge informed him that the case had been dismissed by the City.  (Id.)  Plaintiff states

9   there was never any settlement or compromise entered by him.  (Id.)

10        According to other pedicab operators, Officer Thompson refers to Plaintiff as "The Angry

11  Black Man."  (Id. ¶ 8.)  During 2010, there were only about 6 black pedicab operators out of about

12  600 pedicab operators and all have had problems with the San Diego Police.  (Id.)  Mr. Cedric

13  Torain, Mr. Stacy Walker, Mr. Andrew Marshall and Plaintiff had their permits either suspended or

14  denied.  (Id.)  Plaintiff is not sure what happened with one other black operator.  (Id.)  Mr. Roy is the

15  only black pedicab operator who continued operating.  (Id.)

16                                        **Discussion**

17  **A.      Requests for Judicial Notice**

18        Defendants filed a request for judicial notice as to their exhibits numbered 4, 5, 11, 12, 13,

19  14.  (Dkt No. 33-3.)  These documents concern records from the Superior Court of California and

20  California Civil Jury Instructions Nos. 1602, 1603, 1500 and 1600.  (Id.)  Defendants filed another

21  request for judicial notice as to the Certified Copy of City of San Diego Ordinance No. O-19898.

22  (Dkt. No. 52-1.)  The Court may take judicial notice of facts that are "not subject to reasonable

23  dispute that is either (1) generally known within the territorial jurisdiction of the trial court or (2)

24  capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably

25  be questioned."  Fed. R. Evid. 201(b).  Plaintiff has not objected to the request for judicial notice.

26  The Court concludes that these documents are appropriate for judicial notice.  Accordingly, the

27  Court GRANTS Defendants' requests for judicial notice.

28  **B.      Evidentiary Objections**

Plaintiff objects and seeks to strike the declaration of Defendant Pazargadi.  Plaintiff alleges that Pazargadi has refused to attend his deposition.  (Dkt. Nos. 46, 48.)  Plaintiff's counsel states that he left several messages with defense counsel to reschedule but counsel never returned his phone calls.  (Dkt. No. 48 ¶ 2.)   At the hearing, Plaintiff's counsel stated that Pazargadi had not yet been deposed.

According to Defendants, Plaintiff scheduled the deposition of Pazargadi on the last day of fact discovery on February 14, 2012.  (Dkt. No. 49-1, Riley Decl. ¶ 3.)  On February 14, 2012, Pazargadi called in sick to work.  (Id.)  The City offered to extend the discovery deadline by way of a joint motion but Plaintiff refused.  (Id.)  Defense counsel contends that Plaintiff's assertion that he called defense counsel several times to reschedule the deposition without a return call is false.  (Id. ¶ 4.)  Defense counsel highlights that Plaintiff's counsel has not provided any written evidence memorializing his efforts to reschedule Pazargadi's deposition.  (Id.)  In addition, Plaintiff did not bring this discovery dispute to the Court's attention.  (Id.)

The Court agrees with Defendants.  At the motion hearing, Plaintiff did not provide any facts to show any diligence in trying to cure any defects on this discovery issue.  There were many options available to Plaintiff which he did not pursue.  In addition, the facts in Pazargadi's declaration are not directly disputed.  Accordingly, the Court DENIES Plaintiff's request to strike the declaration of Defendant Pazargadi.

Defendants also seek to strike the declarations of Maciej Grzegorek and Abraham Viergen which were provided for the first time by Plaintiff in his opposition.  (Dkt. No. 43.)  Defendants argue that Plaintiff did not identify these persons in his initial Rule 26(a) disclosures, in written discovery or in his deposition.  Defendants argue that introducing these new declaration is improper, and unduly prejudicial to them.  Defendants also claim that these declarations contradict and supplant Plaintiff's previous deposition testimony.  At the hearing, Plaintiff states that he was unable to locate these witnesses until after the filing of the motion for summary judgment in February or March 2012.  However, Plaintiff has failed to show diligence in pursuing these witnesses throughout discovery.  In addition, these declarations do not assist Plaintiff in establishing a genuine issue of material fact as to slander or racial discrimination.  Accordingly, the Court GRANTS Defendants'

1  motion to strike the declarations of Grzegorek and Viergen.

2  **C.     Legal Standard pursuant to Federal Rule of Civil Procedure 56**

3         Federal Rule of Civil Procedure 56 empowers the Court to enter summary judgment on

4  factually unsupported claims or defenses, and thereby "secure the just, speedy and inexpensive

5  determination of every action."  Celotex Corp. v. Catrett, 477 U.S. 317, 325, 327 (1986).  Summary

6  judgment is appropriate if the "pleadings, depositions, answers to interrogatories, and admissions on

7  file, together with the affidavits, if any, show that there is no genuine issue as to any material fact

8  and that the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  A fact

9  is material when it affects the outcome of the case.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242,

10  248 (1986).

11        The moving party bears the initial burden of demonstrating the absence of any genuine issues

12  of material fact.  Celotex Corp., 477 U.S. at 323.  The moving party can satisfy this burden by

13  demonstrating that the nonmoving party failed to make a showing sufficient to establish an element

14  of his or her claim on which that party will bear the burden of proof at trial.  Id. at 322-23.  If the

15  moving party fails to bear the initial burden, summary judgment must be denied and the court need

16  not consider the nonmoving party's evidence.  Adickes v. S.H. Kress & Co., 398 U.S. 144, 159-60

17  (1970).

18        Once the moving party has satisfied this burden, the nonmoving party cannot rest on the

19  mere allegations or denials of his pleading, but must "go beyond the pleadings and by her own

20  affidavits, or by the 'depositions, answers to interrogatories, and admissions on file' designate

21  'specific facts showing that there is a genuine issue for trial.'"  Celotex, 477 U.S. at 324.  If the non-

22  moving party fails to make a sufficient showing of an element of its case, the moving party is

23  entitled to judgment as a matter of law.  Id. at 325.  "Where the record taken as a whole could not

24  lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'"

25  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).  In making this

26  determination, the court must "view[] the evidence in the light most favorable to the nonmoving

27  party."  Fontana v. Haskin, 262 F.3d 871, 876 (9th Cir. 2001).  The Court does not engage in

28  credibility determinations, weighing of evidence, or drawing of legitimate inferences from the facts;

1    these functions are for the trier of fact.  Anderson, 477 U.S. at 255.

2    **D.      First Cause of Action - Violation of Federal Civil Rights Against All Defendants**

3          Section 1983 is not itself a source of substantive rights, but merely provides a vehicle for a

4    plaintiff to bring federal statutory or constitutional challenges to actions by state and local officials.

5    Graham v. Connor, 490 U.S. 386, 393-94 (1989); Anderson v. Warner, 451 F.3d 1063, 1067 (9th

6    Cir. 2006).  To prevail under § 1983, a plaintiff must prove that (1) the defendants deprived him of a

7    federal statutory or constitutional right, and (2) the defendants acted under color of state law.  West

8    v. Atkins, 487 U.S. 42, 48 (1988).

9          In the first amended complaint, Plaintiff alleges constitutional claims under 42 U.S.C. §

10   1983.  It alleges violations of Plaintiff's "right to free speech, to petition grievances, due process,

11   and equal protection as secured by the First, Fifth, and Fourteenth Amendments to the

12   Constitution."[3]  (FAC ¶ 13.)  In the next paragraph, Plaintiff specifically states that Defendants'

13   actions violated "Plaintiff's substantive due process right to liberty.  Plaintiff has been deprived of

14   his liberty by the Defendants through a series of constant acts of harassment of Defendants that

15   shock the conscience."  (Id. ¶ 14.)  Defendants appear to move for summary judgment only on the

16   procedural due process claim.  Plaintiff opposes.[4]

17         **1.      Procedural Due Process**

18         Defendants argue that Plaintiff cannot sustain a claim for violation of his procedural due

19   process rights.  Plaintiff opposes arguing that failure to hold a pre-deprivation hearing and failure to

20

21

22   ───────────────

[3]In their moving papers, Defendants also argue that "Plaintiff Cannot Sustain a Claim for
23   Violation of the Fourth Amendment for Excessive Use of Force" because in discovery Plaintiff alluded
to an excessive amount of force used in his arrest.  In response, Plaintiff provides an opposition to
24   Defendants' arguments.  The Court notes that the first amended complaint does not allege a claim of
excessive force under the Fourth Amendment.  Therefore, the Court does not address the excessive force
25   issue as it is not a cause of action in the FAC.

26        [4]As part of his opposition, Plaintiff discusses the issue that stealing his valid permit on March
18, 2010 amounts to a seizure under the Fourth Amendment, (opp. at 2-3), and that there is clear
27   evidence of a retaliation claim under 42 U.S.C. § 1983 for exercising his First Amendment rights.  (Opp.
at 3.)  First, there is no cause of action for seizure under the Fourth Amendment in the first amended
28   complaint.  Second, based on the briefs, it appears that Plaintiff's first amendment cause of actions is
based on retaliation.  Defendants do not move for summary judgment on this issue; therefore, it will not
be discussed.

1  hold a post-deprivation hearing regarding the suspension of the permit he obtained on April 1, 2010[5]

2  for six months violated his procedural due process rights.

3         The Due Process Clause of the Fourteenth Amendment prohibits states from depriving "any

4  person of life, liberty, or property, without due process of law."  U.S. CONST. amend. XIV, § 1.  This

5  provision imposes "procedural limitations on a States power to take away protected entitlements."

6  District Attorney's Office for Third Judicial Dist. v. Osborne, 557 U.S. 52, 67 (2009).  This Clause

7  clothes individuals with the right to both substantive[6] and procedural due process.  United States v.

8  Salerno, 481 U.S. 739, 746 (1987) (analyzing the Due Process Clause of the Fifth Amendment).

9  Substantive due process "prevents the government from engaging in conduct that shocks the

10  conscience . . . or interferes with rights implicit in the concept of ordered liberty . . . ."  Id. (internal

11  quotation marks and citations omitted).  Procedural due process requires that the government's

12  deprivation of life, liberty, or property, even if consistent with substantive due process, "be

13  implemented in a fair manner."  Id. (internal quotation marks and citation omitted).

14         To plead procedural due process violations, a plaintiff must allege: (1) a liberty or property

15  interest exists that has been subject to interference by the state; and (2) the procedures attendant

16  upon the deprivation of an existing interest were constitutionally insufficient.  Kentucky Dept. of

17  Corrections v. Thompson, 490 U.S. 454, 460 (1990).

18              **a.    Property Interest**

19         The threshold issue is whether Plaintiff had a property interest in the permit he obtained on

20  April 1, 2010.  Defendants argue that because the renewed permit was fraudulently obtained, there is

21  no property interest in the permit.  Plaintiff alleges that being deprived of his right to engage in his

22

23         [5]The Court assumes that the parties are discussing the suspension of the permit he obtained on
   April 1, 2010.  Plaintiff's permit was taken by officers two times.  The first time it was taken was when
24  he was arrested on March 18, 2010.  The second time, his new permit, obtained on April 1, 2010, was
   suspended on April 2, 2010.  Consequently, his permit was taken by officers sometime after April 2,
25  2010.  In the motion for summary judgment, Defendants summarily argue the procedural due process
   issue as to both incidents.  Plaintiff's opposition does not address which incident he is talking about as
26  to the pre-deprivation hearing but discusses the April 2, 2010 suspension in the post-deprivation hearing
   discussion.  The administrative decision concerned the April 2, 2010 suspension.  Therefore, the Court
27  addresses procedural due process as it relates to the April 2, 2010 suspension.

28         [6]Defendants do not move for summary judgment on the substantive due process claim.
   Therefore, that claim remains.

1  business or profession is a protected property right.

2       Whether a property right exists is a question of state law.  See Vandevere v. Lloyd, 644 F.3d

3  957, 963 (2011).  Property interests are not constitutionally created but "are created and their

4  dimensions are defined by existing rules or understandings that stem from an independent source

5  such as state law-rules . . . ."  Bd. of Regents of State Colls. v. Roth, 408 U.S. 564, 577 (1972).  "To

6  have a property interest in a benefit, a person clearly must have more than an abstract need or desire

7  for it.  He must have more than a unilateral expectation of it.  He must, instead, have a legitimate

8  claim of entitlement to it."  Id.  If a cognizable property interest is implicated, a court must then

9  determine whether the government's action was arbitrary or irrational.  Crowley v. Courville, 76

10  F.3d 47, 52 (2d Cir. 1996).

11       Defendants argue that Plaintiff does not have a property interest in his 2010 permit because it

12  was fraudulently obtained.  Defendants state that Plaintiff was given a post-deprivation hearing on

13  August 12, 2010 where he waived any error in the service of the notice of hearing.  Alternatively,

14  Defendants contend if Plaintiff had a valid permit and a viable property interest at the time his

15  pedicab permit was seized, the City had a legitimate interest in protecting the safety of the public.

16  The city was able to meet both public safety and Plaintiff's due process rights by providing a post-

17  deprivation hearing.

18       In California, only one court has addressed pedicab permits in connection with a procedural

19  due process claim.  Wawrzynski v. City of San Diego, D059336, 2012 WL 1201902 (Cal. Ct. App.

20  Apr. 11, 2012).  In that case, the San Diego City Council approved the new pedicab business

21  regulations in September 2009.  Id. at 1.  The regulation designated downtown San Diego as a

22  restricted pedicab zone and required an owner to obtain a pedicab restricted zone decal for each

23  pedicab and authorized the city counsel to set the number of pedicab restricted zone decals to be

24  issued.  Id. at 2.  The city council limited the number of pedicab restricted zone decals that could be

25  issued each year to 250, 35 of which were issued to new entrants in the pedicab business.  Id.  The

26  decals had to be renewed every year.  Id.

27       Plaintiff filed a complaint against the city based on the adverse impact the new pedicab

28  regulation had on his business and alleged "the City's refusal to issue him as many pedicab decals as

1   it has in the past, without prior notice and hearing, violated his procedural due process rights." <u>Id.</u> at

2   2.  The court of appeal affirmed the trial court's decision to sustain without leave to amend the

3   City's demurrer.  The court of appeal stated that Plaintiff had not "identified any existing state law

4   rule that entitled him to receive each year the same number of pedicab decals the City has issued

5   him in the past." <u>Id.</u> at 4.  Therefore, the allocation of restricted pedicab zone decals did not violate

6   his federal due process rights.  <u>Id.</u> (<u>citing</u> <u>Luxor Cab Co. v. Cahill</u>, 21 Cal. App. 3d 551, 558 (1971)

7   (holding that using the street by taxicabs is a privilege that may be granted or withheld without

8   violating due process)).

9           In another case, a court held that there is no protected property interest in obtaining a

10  "Certificate of Public Necessity and Convenience" to operate "for hire" vehicles, including

11  pedicabs.  <u>Green Turtle Landscaping Co. v City of New Orleans</u>, No. Civ. A. 01-1666, 2003 WL

12  22272188 *1-3 (E.D. La. Oct. 2, 2003) (explaining that plaintiffs understood the temporary nature of

13  the permission to operate a pedicab); <u>see also</u> <u>Wasatch Pedicab Co., LLC v. Salt Lake City Corp.</u>,

14  07-CV-546-TS, 2008 WL 2224830 (D. Utah May 27, 2008) (granting motion to dismiss as to due

15  process claim because complaint did not allege more than a unilateral expectation that the Revocable

16  Permit's conditions would be altered or that the City would enact an ordinance that provided lower

17  insurance rates as these were discretionary acts).

18          Further, courts have held there is no property interest in a discretionary grant of a license or

19  permit.  <u>Neuwirth v. La. State Bd. of Dentistry</u>, 845 F.2d 553, 557 (5th Cir. 1988) (use of the word

20  "may" and not "shall" in obtaining dental license did not create a constitutionally protected property

21  or liberty interest in dental license); <u>Clark v. City of Hermosa Beach</u>, 48 Cal. App. 4th 1152, 1179-

22  83 (1996) (participation of biased city official in hearings did not support damages claim for

23  violation of substantive or procedural due process because applicant had no protected property

24  interest in a discretionary permit); <u>Yale Auto Parts, Inc. v. Johnson</u>, 758 F.2d 54, 58-59 (2d Cir.

25  1985) (allegations that agency officials acted arbitrarily and capriciously in denying discretionary

26  land use permit does not state a section 1983 claim because plaintiff has no protected property

27  interest in discretionary permit).

28          Plaintiff cites to <u>Bell v. Burson</u>, 402 U.S. 535, 542 (1971) which held that there is a property

interest in a driver's license.  However, no court has held that a pedicab license contain the same property interests as a driver's license.

The Court concludes there is no property interest in a pedicab permit.  Lower courts have held that there is no property interest in operating a pedicab.  See Wawrzynski, 2012 WL 1201902 at 2; Green Turtle Landscaping Co., 2003 WL 22272188 at 1-3; Wasatch Pedicab Co., LLC, 2008 WL 2224830 at 5.  In addition, Plaintiff's pedicab permit is a discretionary one.  The ordinance grants the City, based on certain factors, discretion to deny an applicant a permit.  See Dkt. 33-13, Ds' Ex. 3, S.D. Mun. Code section 83.0101 *et seq.*

### b.    Procedures

Alternatively, even if there was a property interest in a pedicab permit, Plaintiff received the process he was due at the post-deprivation hearing.  The basic requirements of due process are the right to notice and the opportunity to be heard "at a meaningful time and in a meaningful manner." Logan v. Zimmerman Brush Co., 455 U.S. 422, 437 (1982).  The extent and manner of determining what process is due in any given situation depends on "(1) the private interests at stake; (2) the risk that the procedure used will lead to erroneous results and the probable value of the suggested procedural safeguard; (3) and the governmental interests affected."  Little v. Streater, 452 U.S. 1, 13 (1981) (citing Matthews v. Eldridge, 424 U.S. 319, 335 (1976)).  This "balancing test" determines what the due process clause requires, even if state law or prison regulations call for something different.  Cleveland Bd. Of Educ. v. Loudermill, 470 U.S. 532, 541 (1985); Vitek v. Jones, 445 U.S. 480, 491 (1980).

"Due process is flexible and calls for such procedural protections as the particular situation demands."  Gilbert v. Homar, 520 U.S. 924, 931 (1997) (citing Morrissey v. Brewer, 408 U.S. 471, 481 (1972)).  The Supreme Court has held that due process does not always require a pre-deprivation hearing and "where a State must act quickly, or where it would be impractical to provide pre-deprivation process, post-deprivation process satisfies the requirements of the Due Process Clause."  Id. at 930; see also F.D.I.C. v. Mallen, 486 U.S. 230, 240-41 (1988) (holding that suspension of indicted bank officers may be necessary to protect interests of depositors and to maintain public confidence in the banking institutions.)  "An important government interest,

1   accompanied by a substantial assurance that the deprivation is not baseless or unwarranted, may in

2   limited cases demanding prompt action justify postponing the opportunity to be heard until after the

3   initial deprivation." Mallen, 486 U.S. at 240.

4            Defendants argue that the lack of a pre-deprivation hearing does not violate due process

5   because they have a legitimate interest to protect the safety of pedicab passengers and the public

6   safety when they suspended his permit on April 2, 2010.  Plaintiff had pending charges for reckless

7   driving.  Plaintiff opposes arguing that failure to hold a pre-deprivation hearing violated his due

8   process rights because his private interest in trying to earn a living is very substantial.  He cites Bell

9   v. Burson, 402 U.S. 535 (1971) where the Supreme Court held that there is a property interest in a

10  driver's license; however, as discussed above, no court has held that a pedicab permit is similar to

11  the protected property right of a driver's license.

12           In this case, Plaintiff's permit was suspended under San Diego Municipal Code section

13  83.0127(a)(5). (Dkt. No. 33-18, Ds' Ex. 8.)   San Diego Municipal Code provides that when a notice

14  of suspension is issued, the operator may request a hearing within 10 days of service of the notice.

15  S.D. Mun. Code § 84.0128(b).  In addition, when the pedicab is operated in a manner that creates an

16  immediate safety hazard, the Code provides for the immediate seizure of the permit by a peace

17  officer.  Id. § 83.0129.  Further, the purpose of the pedicab ordinance is to "protect the health, safety

18  and welfare of the general public, and passengers using pedicabs.  It is further the intent of this

19  Division to facilitate the safe, orderly flow of traffic and to relieve congestion and traffic hazards

20  associated with pedicab use." S.D. Mun. Code § 83.0101.

21           Based on the fact that Plaintiff had pending citation and criminal charges against him for

22  improperly operating a pedicab, the government interest was high.  Therefore, confiscating

23  Plaintiff's permit according to the provisions in the ordinance, did not violate due process.

24  Accordingly, the Court concludes that Plaintiff has not shown there is a genuine issue of material

25  fact that his procedural due process rights were violated by not having a pre-deprivation hearing.

26           In addition, as to the post-deprivation hearing, TED sent the suspension letter and notice on

27  April 2, 2010.  (Dkt. No. 33-18, Ds' Ex. 8.)  It was sent to the address he provided in his application.

28  However, the letter was returned undeliverable.  (Id.)  Plaintiff does not state what specific date he

1    received the suspension letter but it appears he received it after his new permit was taken by

2    Hibshman and Thompson sometime after April 24, 2010.  (Dkt. No. 47, P's Decl. ¶ 6.)  Plaintiff

3    does not provide any facts showing when he filed his appeal.[7]

4         A hearing was eventually held on August 12, 2010.  At the hearing, Defendants provided

5    Plaintiff an opportunity to delay the hearing due to "defective notice."  However, Plaintiff declined a

6    delay and proceeded with the hearing.  (Dkt. No. 33-19, Ds' Ex. 9.)  Plaintiff did not appeal the

7    administrative decision revoking his permit.

8         Based on the record, Plaintiff has not come forth with facts to create a genuine issue of

9    material fact that a delay of his hearing violated due process.  He has not shown that the delay was

10   not caused by him not providing an accurate mailing address on his permit application.

11   Accordingly, the Court GRANTS Defendants' motion for summary judgment as to the procedural

12   due process claim.

13   **E.      Second Cause of Action: Conspiracy to Violate Federal Rights Against Defendants**

14   **Hibshman and Pazargadi**

15        Defendants argue that because Plaintiff failed to show that his procedural due process rights

16   were violated, Plaintiff cannot demonstrate that there was a conspiracy to violate his federal rights.

17   In addition, Defendants argue that he failed to establish the necessary elements for this claim.

18        In opposition, Plaintiff argues there is sufficient evidence to support a conspiracy claim

19   against the City[8], Hibshman and Pazargadi because their misbehavior was directed at forcing

20   Plaintiff out of business violating his due process rights.

21        To prove a conspiracy in a §1983 case, there must be "(1) the existence of an express or

22   implied agreement among the defendant officers to deprive him of his constitutional rights, and (2)

23   an actual deprivation of those rights resulting from that agreement."  Ting v. United States, 927 F.2d

24

25        [7]In his declaration, Plaintiff provides facts about how his new permit was taken, how he tried
     to get it back, and how he finally got a hearing date; however, he does not provide any facts to show he
26   complied with the provisions in the ordinance regarding appealing a suspension letter.  He does not
     provide specific dates as to when he received the suspension letter, when and whether he filed an appeal
27   of the suspension, and when he received notice of the hearing.  (Dkt. No. 47, P's Decl. ¶ 6.)

28        [8]The Court notes that the conspiracy cause of action in the FAC is only alleged against
     Defendants Hibshman and Pazargadi.

1504, 1512 (9th Cir. 1991).  There must be an "agreement or meeting of minds to violate" Plaintiff's

constitutional rights.  Woodrum v. Woodward County, Okl., 866 F.2d 1121, 1126 (9th Cir. 1989).

The plaintiff must provide specific facts to support the existence of the alleged conspiracy.  Burns v.

County of King, 883 F.2d 819, 821 (9th Cir. 1989).  Moreover, a claim for conspiracy fails if there is

no underlying constitutional deprivation.  Hart v. Parks, 450 F.3d 1059, 1071 (9th Cir. 2006).

Because the Court has determined that there was no procedural due process right violation,

there can be no conspiracy to violate procedural due process.  Alternatively, even if there was a

procedural due process claim, Plaintiff has not come forward with facts to demonstrate a genuine

issue of a material fact that there was a conspiracy to violate his procedural due process rights.

Defendants argue that Plaintiff cannot show that Pazargadi and Hibshman had a meeting of the

minds in order to form a conspiracy to deprive him of his rights.   In his deposition, Plaintiff states

that Pazargadi is a defendant because he was the one who signed the letter suspending Plaintiff's

pedicab permit.  (Dkt. No. 33-9, Ds' Exs. 1, Howard Depo. at 131:25-135:13.)  Plaintiff testified that

he had never met and did not even know who Pazargadi was before he signed the letter.  (Id. at 132:

4-9.)  In a declaration, Pazargadi states that he never met Plaintiff prior to April 2, 2010 and at the

time he signed the letter, he was not aware of his race or national origin.  (Dkt. No. 33-17, Ds' Ex. 7

¶ 8.)  Pazargadi also states that he was not told by Hibshman to suspend the April 1, 2010 pedicab

operators permit.  (Id. ¶ 9.)

In opposition, Plaintiff summarily argues that he can maintain a conspiracy against

Defendants and cites to Benigni v. City of Hemet, 879 F.2d 473, 478 (9th Cir. 1988) which is not

supportive as it does not concern a conspiracy cause of action.  Plaintiff summarily states that

Thompson, Hibshman and other cops would harass Plaintiff when he operated a pedicab, stopped

him for no reason and scared off customers.  In addition, his permit was stolen on March 18, 2010

and again on April 24, 2010 by officers.  As a result, Plaintiff was put out of business by Hibsman,

Thompson and Pazargadi.  (See Dkt. No. 47, Howard Decl. ¶¶ 2, 4, 8.)

Plaintiff has not disputed Defendants' facts that he never met Pazargadi until the letter of

April 2, 2010 was signed, or that Pazargadi and Hibshman had any discussions about suspending

Plaintiff's permit.  Plaintiff only summarily makes a statement that Hibshman and Pazargadi put him

1   out of business.  There are no factual allegations to support a conspiracy.

2        Accordingly, Plaintiff has failed demonstrate a genuine issue of fact as to conspiracy to

3   violate his procedural due process rights.  Defendants are entitled to judgment as a matter of law as

4   to the claim for conspiracy to violate Plaintiff's procedural due process rights.  However, the

5   remaining conspiracy claims to violate other constitutional rights remain.

6   **F.      Qualified Immunity**

7        Defendants Hibshman and Pazargadi argue they are entitled to qualified immunity on the

8   procedural due process claim.  Plaintiff opposes.  Because the Court grants Defendants' motion for

9   summary judgment as to the procedural due process claim, it need not address the issue of qualified

10  immunity.

11  **G.      State Law Claims**

12       In order to address the state law claims, the retroactivity of the Pedicab Ordinance

13  Amendments needs to be addressed.  Pursuant to the Court's order, Defendants filed a supplemental

14  brief on the retroactivity of the ordinance on May 5, 2012 and Plaintiff filed a response on May 14,

15  2012.  (Dkt. Nos. 52, 53.)

16       **1.      Retroactivity of Pedicab Ordinance Amendments**

17       Plaintiff obtained a pedicab permit in April 2009 which expired a year later on April 30,

18  2010.  (Dkt. No. 47-4, Howard Decl. attached.)  Permits under the former ordinance expired a year

19  after issuance.  On September 11, 2009, the San Diego City Council amended the pedicab ordinance,

20  which became effective on October 11, 2009.  The amended ordinance changed the date regarding

21  the validity of an operating permit.  New permits were to be valid from the date issued through

22  December 31st of the year for which it is issued.  S.D. Mun. Code § 83.0106(a).  When Plaintiff was

23  stopped by Officer Hibshman on March 18, 2010 for an invalid permit, the parties disagree whether

24  Plaintiff had a valid permit.  That question is contingent on whether the amendment was retroactive

25  or not.

26        There is a traditional presumption against the retroactive application of legislation.

27  Landgraf v. USI Film Prods., 511 U.S. 244, 265, (1994).  In California, "[i]t is an established canon

28  of interpretation that statutes are not to be given a retrospective operation unless it is clearly made to

appear that such was the legislative intent." <u>Aetna Cas. & Sur. Co. v. Indus. Accident Comm'n</u>, 30 Cal. 2d 388 (1947).  The California Supreme Court "has consistently held that a statute should not be given retroactive effect so as to deprive an individual of a pre-existing right unless the Legislature has clearly expressed its intention to accomplish that end." <u>Henrioulle v. Marin Ventures, Inc.</u>, 20 Cal. 3d 512, 520 (1978).  The Legislature is well acquainted with this fundamental rule and uses clear language when it intends a statute to apply retroactively.  <u>Balen v. Peralta Junior College Dist.</u>, 11 Cal. 3d 821, 828 (1974).  For example, the legislature was clear when a statute that was enacted in 1947 provided that any person "since the first day of July, 1944 has been or hereafter convicted . . . ." would apply retroactively.  <u>Di Genova v. State Bd. of Ed.</u>, 57 Cal. 2d 167, 176 (1962).  In addition, it was clear when the Education Code statute providing for permissive rather than mandatory denial of credentials for conviction that occurred "prior to the effective date" of the provision, was retroactive.  <u>Id.</u>

"Whether a statute should apply retrospectively or only prospectively is, in the first instance, a policy question for the legislative body enacting the statute."  <u>Preston v. State Bd. of Equalization</u>, 25 Cal. 4th 197, 221–222 (2001).  Although a statute is generally presumed to operate prospectively only, when retroactive application is clearly intended, that legislative intent must be carried out unless due process considerations prevent it.  <u>Id.</u> at 222.

San Diego Municipal Code section 83.0106 states, "[a]n *Operating permit* shall be valid from the date issued through December 31st of the year for which it is issued."  (Dkt. No. 52-4, City's Ex. 28 at 7.)  In addition, section 3 of the ordinance passed on September 11, 2009 states "this ordinance shall take effect and be in force on the thirtieth day from and after its final passage."  (<u>Id.</u> at 26.)

Here, Defendants argue that the plain reading of the ordinance demonstrates that the City Council intended the provision to be applied retroactively.  Plaintiff contends that the "shall" language demonstrates that the statute applies to permits issued in the future, not existing ones.

Because both parties' interpretations are plausible, the ordinance is ambiguous as to what the City Council intended.  In their supplemental brief, Defendants have not provided any legislative documents to show the City Council's intent to make this section retroactive to permits issues prior

1  to the ordinance's enactment which expired on a yearly basis.  Accordingly, the Court concludes that

2  the ordinance is not retroactive.  Therefore, Plaintiff had a valid permit on the day of the incident on

3  March 18, 2010.

4  **H.    Third Cause of Action - False Imprisonment Against Defendants Hibshman and City of**

5  **San Diego**

6  Defendants argue that since Hibshman had reasonable suspicion to detain Plaintiff and the

7  other officers had probable cause to arrest Plaintiff, he is not liable for false imprisonment.  Plaintiff

8  does not provide an opposition on this issue.

9  The first amended complaint alleges that on March 18, 2010, Plaintiff was seized and

10  arrested by Hibshman and two other policemen employed by the City of San Diego.  He claims that

11  he was arrested without probable cause and was imprisoned for four days when he was released on

12  his own recognizance.  (FAC ¶¶ 31-32.)

13  "Under California law, the elements of a claim for false imprisonment are: (1) the

14  nonconsensual, intentional confinement of a person, (2) without lawful privilege, and (3) for an

15  appreciable period of time, however brief."  Young v. County of Los Angeles, 655 F.3d 1156, 1169

16  (9th Cir. 2011) (quoting Easton v. Sutter Coast Hospital, 80 Cal. App. 4th 485, 496 (2000)).

17  "[F]alse arrest" and "false imprisonment" are not separate torts.  False arrest is but one way of

18  committing a false imprisonment . . . .' [Citation.]"  Asgari v. City of Los Angeles,15 Cal. 4th 744,

19  753 n. 3 (1997).

20  Although there is no governmental immunity for false imprisonment, California Penal Code

21  section 847 provides that there is no civil liability for false imprisonment if the peace officer, at the

22  time of the arrest, had reasonable cause to believe the arrest was lawful.  Asgari, 15 Cal. 4th at 752;

23  O'Toole v. Superior Court, 140 Cal. App. 4th 488, 548 (2006).  "Reasonable cause to arrest exists

24  when the facts known to the arresting officer would lead a reasonable person to have a strong

25  suspicion of the arrestee's guilt."  O'Toole, 140 Cal. App. 4th at 511 (citation omitted).  This is an

26  objective standard.  People v. Adair, 29 Cal. 4th 895, 904–05 (2003).  Where the facts are disputed,

27  the issue of reasonable cause for an arrest is a question of law."  Id.  A city can be vicariously liable

28  for injuries proximately caused by a public employee who acted within the scope of his employment.

1  Cal. Gov. Code § 815.2(a).

2       In their moving papers, Defendants argue that the Officers had probable cause to arrest

3  Plaintiff and therefore they argue that the motion for summary judgment should be granted.  Plaintiff

4  does not provide an opposition to Defendants' motion for summary judgment on false imprisonment.

5       At the hearing, Defendants agreed that there were two separate incidents on March 18, 2010.

6  The first being the initial detention of Plaintiff for either visibility of permit or failure to have a valid

7  permit.  The second being the chase and subsequent arrest of Plaintiff.

8       According to the front of the citation, the first detention by Officer Hibshman was for failure

9  to have a valid permit because it expired.  However, on a different page of the same citation, there

10  are handwritten notes by Hibshman that state, "[p]ermit could not be seen."  (Dkt. No. 33-15, Ds'

11  Ex. 5.)  Although it is an issue of fact as to the reason why Plaintiff was initially stopped, it does not

12  create a genuine material issue of fact as to false imprisonment.  If Plaintiff was stopped because his

13  permit could not be seen, then the stop was reasonable.  If Plaintiff was stopped improperly by

14  Hibshman because he believed he had an invalid permit, he would be immune under Cal. Penal

15  Code section 847(b)(1).  Although the Court determined that the amended ordinance was not

16  retroactive, Hibshman believed the ordinance was valid when the ordinance became effective on

17  October 11, 2009.  As the Court stated above, the ordinance itself is not clear whether it applied

18  retroactively or not.  The ordinance could be interpreted to be either retroactive or not.  Therefore, a

19  reasonable person reading the statute could come to a conclusion that the ordinance was applicable

20  on the effective date of the amended ordinance.  Accordingly, the Court concludes that it was

21  reasonable for Officer Hibshman to believe that the ordinance was retroactive.

22       As to the second detention, there is a genuine issue of material fact as to whether there was

23  probable cause to arrest Plaintiff.  The second detention by Hibshman and the officers occurred

24  when Hibshman and a patrol car attempted to get Plaintiff to stop because he was violating traffic

25  rules.  (Dkt. No. 33-12, Ds' Exhibit 2, Hibshman Decl. ¶ 5-7.)  Hibshman stated that he yelled and

26  signaled at Plaintiff to stop; however, Plaintiff proceeded to evade them and in the process drove

27  recklessly, violating vehicle and penal codes, down to Harbor Drive.  (Id. ¶ 7.)  In his declaration,

28  Plaintiff states that Hibshman never told him to stop or said anything.  (Dkt. No. 47, Howard Decl. ¶

4.)  Plaintiff asserts that Hibshman and the patrol car were ramming their vehicles into his pedicab and he was swerving to avoid getting injured.  (Id.)

Based on these disputed facts, there is a genuine issue of material fact as to whether Plaintiff was falsely imprisoned.  The Court GRANTS in part and DENIES in part Defendants' motion for summary judgment on the false imprisonment claim.  Specifically, the Court GRANTS Defendants' motion for summary judgment on the false imprisonment claim as to the first incident and DENIES Defendants' motion for summary judgment on the false imprisonment claim as to the second incident.

## I.     Fourth Cause of Action - Racial Discrimination against Defendants Hibshman and City of San Diego

Defendants contend that Plaintiff cannot show a genuine issue of fact to support a claim of racial discrimination.  Plaintiff argues there was racial discrimination because other black pedicab operators were forced to stop pedicabbing.

In the first amended complaint, Plaintiff alleges racial discrimination against Defendants Hibshman and the City of San Diego.  (FAC ¶¶ 35-40.)  He states, "Defendants denied Plaintiff the benefits of equal protection in enforcement of their laws, considering Plaintiff grievances, and obeying their own laws and discriminated against Plaintiff also because of his race."  (Id. ¶ 37.)  The City operated one or more programs that receive federal financial assistance.  (Id. ¶ 36.) "Defendants acted knowingly, willfully, and maliciously, and with reckless and callous disregard for Plaintiff's federally protected rights."  (Id. ¶ 40.)  Based on the language of the first amended complaint, it appears that Plaintiff is alleging an equal protection claim under the United States Constitution.[9]

"The Equal Protection Clause of the Fourteenth Amendment commands that no State shall 'deny to any person within its jurisdiction the equal protection of the laws,' which is essentially a direction that all persons similarly situated should be treated alike."  City of Cleburne v. Cleburne Living Ctr., 473 U.S. 432, 439 (1985).  "To state a claim under 42 U.S.C. § 1983 for a violation of

---

[9]The Court notes that this claim is duplicative as Plaintiff alleges an equal protection claim in the First Cause of Action.

the Equal Protection Clause of the Fourteenth Amendment a plaintiff must show that the defendants acted with an intent or purpose to discriminate against the plaintiff based upon membership in a protected class." Lee v. City of Los Angeles, 250 F.3d 668, 686 (9th Cir. 2001) (citation omitted). "Where the challenged governmental policy is "facially neutral," proof of its disproportionate impact on an identifiable group can satisfy the intent requirement only if it tends to show that some invidious or discriminatory purpose underlies the policy." Id.   Stark statistical evidence may constitute proof of a practice of discrimination. The Committee Concerning Community Improvement v. City of Modesto, 583 F.3d 690, 703 (9th Cir. 2009) (citing Village of Arlington Heights v. Metro. Hous. Dev. Corp., 429 U.S. 252, 266 (1977) (noting that absent evidence of very stark statistical disparities, "impact alone is not determinative, and the Court must look to other evidence.")). "If there is no evidence of intentional discrimination, then the court assumes that the challenged actions were not based on discrimination and must inquire only whether the actions were rationally related to a legitimate governmental interest." Id. (citing Hispanic Taco Vendors of Washington v. City of Pasco, 994 F.2d 676, 680 (9th Cir. 1993)).  In a selective law enforcement equal protection claim, a plaintiff must show both a discriminatory effect and a discriminatory motive. Benigni v. City of Hemet, 879 F.2d 473, 477 (9th Cir. 1988).[10]

Without providing a legal standard, Defendants argue that Plaintiff cannot show a genuine issue of material fact to support a claim of racial discrimination.  They discuss Plaintiff's deposition where he states that he was racially discriminated against because Defendants are jealous because he speaks to beautiful women, because Hibshman belongs to the NRA and Officer Thompson is a Mormon.  (Dkt. No. 33-8, Ds' Ex. 1, Howard Depo. at 126:7-127:10.)  Defendants argue that Plaintiff bases his claim of racial discrimination against the City on Pazargadi.  Plaintiff states that he was racially discriminated against by Pazargadi because he concluded that Plaintiff was a danger to the public.  (Id. at 232:22-224:18.)

In opposition, Plaintiff states that Hibshman and non-defendant Thompson refer to him as

---

[10] Plaintiff cites to Benigni in opposing the motion.  In Benigni, a jury entered judgment for the Plaintiff.  The City appealed and the Court, for reasons other than the evidence shown, held that evidence was sufficient to submit theory of equal protection to jury. Id. at 477-78.  The facts in this case are not helpful on the issues in this case.

[10cv2535-AJB(RBB)]

1    "The Angry Black Man."[11]  (Dkt. No. 47, Howard Decl. ¶ 8.)  He states that there were only six

2    black pedicab operator in San Diego during 2010 out of about 600 pedicab operators.  (Id.)  There

3    was Plaintiff, Mr. Roy, Mr. Torain, Mr. Walker, Mr. Marshall and one additional person whose

4    name he does not know.  (Id.)  Mr. Marshall had his pedicab decal suspended because his insurance

5    coverage was not being purchased from Hibshman's insurance person.  (Id.)  Mr. Walker was

6    arrested and had his permit denied for not following an officer's instruction to move his pedicab fast

7    enough.  (Id.)  Mr. Torain also had his pedicab permit suspended.  (Id.)  Mr. Roy is the only black

8    pedicab operating.  (Id.)

9          Plaintiff does not provide any declarations or affidavits from these black pedicab operators

10   who have allegedly been forced to stop pedicabbing.  Based on Plaintiff's statements, it is not clear

11   that the reasons they stopped pedicabbing was based on racial discrimination by Defendants.  In

12   addition, Plaintiff has not provided sufficient data to demonstrate proof of racial discrimination.

13   Therefore, Plaintiff has not shown a genuine issue of material fact as to whether Defendants' racially

14   discriminated against Plaintiff.  Accordingly, the Court GRANTS Defendants' motion for summary

15   judgment as to racial discrimination.

16   **J.    Fifth Cause of Action - Slander Against Defendant Hibshman**

17         Defendants assert that Defendant Hibshman is not liable for slander because Plaintiff had an

18   expired permit so his statement was true based on the ordinance provision.  Plaintiff argues that

19   Hibshman's statement that Plaintiff is barred from pedicabbing in San Diego is false.  Hibshman

20   made these statement in front of other pedicab owners and as a result he lost business and reputation.

21         Plaintiff alleges that in March 2010, Defendant Hibshman made statements to third persons

22   who knew Plaintiff was operating a pedicab in San Diego that Plaintiff was prohibited from

23   operating a pedicab in the City of San Diego.  (FAC ¶ 42.)  Plaintiff claims these statements were

24   slanderous *per se* because Hibshman accused Plaintiff of violating laws, and the statements were

25   false and unprivileged, and were not made as part of his employment duties.  He claims he suffered

26   loss of reputation and loss of business opportunities.  (Id. ¶ 46.)

27   ───────────────

28         [11]Both parties addressed Plaintiff's deposition where he stated that Officer Thompson referred
     to him as the "angry black man."  (Howard Depo. 125:4-6.)  However, page 125 is not provided in the
     record.  It is omitted from Defendants' exhibit and Plaintiff has not provided it to the Court.

"Slander is a false and unprivileged publication, orally uttered . . . which: . . . 3. Tends directly to injure him in respect to his office, profession, trade or business, either by imputing to him general disqualification in those respects which the office or other occupation peculiarly requires, or by imputing something with reference to his office, profession, trade, or business that has a natural tendency to lesson its profits . . . ."  Cal. Civil Code § 46.  A statement that makes charges under any of the four specific categories in the slander statute is "slander per se" and requires no proof of damages.  Duste v. Chevron Prods., Co., 738 F. Supp. 2d 1027 (N.D. Cal. 2010).

Based on Defendant Hibshman's reasonable belief that Plaintiff was driving without a valid permit, the statement that Plaintiff was prohibited from operating a pedicab in San Diego was true. Therefore, Plaintiff has failed to show a genuine issue of material fact that Defendant Hibshman is liable for slander.

In addition, Defendant claims he is immune under California Government Code section 821.6.  Hibshman asserts that there were criminal charges pending and he was part of the investigation and prosecution.  Without providing legal support, Plaintiff argues that the immunity does not apply because his statement was not in furtherance of prosecution or investigation because they were made to individual persons who were not potential witnesses or parties to any of the incidents involved.

Section 821.6 provides, "[a] public employee is not liable for injury caused by his instituting or prosecuting any judicial or administrative proceeding within the scope of his employment, even if he acts maliciously and without probable cause."  Cal. Gov't Code § 821.6.  This immunity provision is to be construed broadly so as to further "its purpose to protect public employees in the performance of their prosecutorial duties from the threat of harassment through civil suits."  Gillan v. City of San Marino, 147 Cal. App. 4th 1033, 1048 (2007).  Section 821.6 applies to police officers as well as public prosecutors.  Strong v. State, 201 Cal. App. 4th 1439, 1461 (2011).

When Plaintiff was arrested, it was the beginning of an investigation and Hibshman made an erroneous comment that Plaintiff can no longer pedicab in San Diego.  Such statements are immune under section 821.6.  See Cappuccio, Inc. v. Harmon, 208 Cal. App. 3d 1486 (1989) (holding that investigator and Dept. were immune from slander liability for erroneous statements about amount of

squid confiscated that defendants were found guilty of underweighing, since statement were made

part of prosecution process); <u>Gillan v. City of San Marino</u>, 147 Cal. App. 4th 1033 (2007) (press

releases during the course of investigation reporting progress or results of investigation cannot give

rise to liability).  Accordingly, the Court GRANTS Defendants' motion for summary judgment as to

slander.

**K.      Sixth Cause of Action - Violation of Cal. Civ. Code section 52.1 against Defendant**

**Hibshman**

Defendants argue that California Civil Code section 52.1 claims essentially duplicates 42

U.S.C. § 1983 claims and courts have concluded that an adverse ruling on 1983 claims bars relief for

the same claims under 52.1.  Plaintiff contends that the section 52.1 claims do not duplicate 42

U.S.C. § 1983 claims.

California Civil Code section 52.1 establishes a private right of action for damages and other

relief against a person who "interferes by threats, intimidation, or coercion," or attempts to so

interfere, with the exercise or enjoyment of a individual's constitutional or other legal right.  Cal.

Civ. Code § 52.1

In the first amended complaint, Plaintiff only alleges that he has the right to petition the

government for grievances under the First Amendment of the U.S. Constitution and Art. 1 of the

California Constitution.  (FAC ¶ 48.)  On January 3, 2010, Plaintiff submitted a complaint with the

Citizen's Review Board on Police Practice against Officer Thompson for harassing various pedicab

operators.  (<u>Id.</u> ¶ 48.)  Hibshman's act of stopping him for an invalid permit and then following him

again to the pier to get arrested constituted malicious retaliation and an attempt at intimidating and

coercing Plaintiff from exercising his constitutional right to petition for grievances.  (<u>Id.</u> ¶¶ 49-51.)

On April 24, 2010, Hibshman and Thompson approached Plaintiff and stole Plaintiff's new

operating permit and did not give him a citation.  (<u>Id.</u> ¶¶ 49, 50.)

In their moving papers, Defendants argue claims of procedural due process, excessive force

and racial discrimination under section 52.1.  In opposition, Plaintiff only contends that the section

52.1 claims do not duplicate 1983 claims and cites to <u>Robinson v. Solano County</u>, 278 F.3d 1007,

1016 (9th Cir. 2002).  However, that case does not concern section 52.1 nor any of the claims

1    against the defendants.

2          In the first amended complaint, Plaintiff only presents a claim for the right to petition the

3    government for grievances under the United States and California Constitution.  Defendants'

4    argument concerning procedural due process is not directed at Plaintiff's claim concerning the right

5    to petition the government for grievances under the United States or California Constitution.  In

6    opposition, Plaintiff does not provide any facts or law to support its position.  Accordingly, because

7    Defendant Hibshman failed to bear his burden on a motion for summary judgment, the Court

8    DENIES Defendants' motion for summary judgment as to violation of California Civil Code section

9    52.1 against Defendant Hibshman.

10   **L.      Seventh Cause of Action - Violation of Cal. Civ. Code Section 52.1 against Defendant**

11           **Pazagardi**

12          Similar to the sixth cause of action, Defendant Pazagardi maintains that the California Civil

13   Code section 52.1 claims essentially duplicates 42 U.S.C. § 1983 claims and courts have concluded

14   that an adverse ruling on 1983 claims bars relief for the same claims under section 52.1.  Plaintiff

15   opposes arguing the section 52.1 claims do not duplicate 42. U.S.C. § 1983 claims.

16          The first amended complaint alleges a violation of Civil Code section 52.1 against Defendant

17   Pazargadi for the right to petition the government for grievances under the United States and

18   California Constitution.  Both parties present the same arguments as in the Sixth Cause of Action

19   against Defendant Hibshman.  For the same reasons discussed in the reasoning above as to

20   Defendant Hibshman, the Court DENIES Defendants' motion for summary judgment as to a

21   violation of California Civil Code section 52.1 against Defendant Pazargadi.

22   **M.      Eighth Cause of Action - Malicious Prosecution Against Defendant Hibshman**

23          Defendants argue that Plaintiff cannot sustain a claim for malicious prosecution.  First,

24   Hibshman had a reasonable belief Plaintiff was violating the ordinance and the termination of

25   Plaintiff's legal proceedings was not adjudicated in his favor.  In opposition, Plaintiff contends that

26   Defendant did not have probable cause to detain Plaintiff and that the criminal proceedings

27   terminated in his favor.

28          "In order to establish a cause of action for malicious prosecution. . . a plaintiff must

1 demonstrate 'that the prior action (1) was commenced by or at the direction of the defendant and

2 was pursued to a legal termination in his, plaintiff's, favor [citations]; (2) was brought without

3 probable cause [citations]; and (3) was initiated with malice [citations].'" Sheldon Appel Co. v

4 Albert & Oliker, 47 Cal. 3d 863, 871 (1989) (quoting Bertero v. Nat'l Gen. Corp., 13 Cal. 3d 43, 50

5 (1974)).

6      Defendants argue that there was probable cause to detain and cite Plaintiff for violation of

7 the Municipal Code based on his expired permit.  Similarly, there was probable cause to arrest

8 Plaintiff for reckless driving, refusal to obey the directions of the traffic officers and the interference

9 with an officers' attempt to stop him for traffic violations.  Plaintiff disagrees and contends there

10 was no probable cause.

11      As discussed above, Defendant Hibshman had a reasonable belief, even though incorrect, to

12 stop and cite Plaintiff for violation of the Municipal Code based on Plaintiff's expired pedicab

13 permit and he had reasonable belief to stop and cite him for not having a visible permit.  Therefore,

14 Plaintiff has not shown there was a genuine issue of material fact as to whether there was no

15 probable cause.  Therefore, there is no need to discuss whether the two legal actions against Plaintiff

16 was terminated in his favor.  Accordingly, the Court GRANTS Defendants' motion for summary

17 judgment as to the malicious prosecution cause of action.

18 **O.**     **Ninth Cause of Action - Intentional Infliction of Emotional Distress Against Defendants**

19        **Hibsman and Pazargadi**

20      Defendants argue that Plaintiff has failed to meet the elements of intentional infliction of

21 emotional distress.  They assert that Hibshman's action of detaining and citing Plaintiff and

22 Pazargadi's signing a suspension letter provided for in the ordinance does not rise to the level of

23 outrageous conduct or recklessness.  In addition, they allege Plaintiff has not alleged nor provided

24 facts to show severe emotional distress.  In opposition, Plaintiff asserts that "arresting an innocent

25 man and then prosecuting him with two charges both of which are later dismissed can constitute

26 such" extreme and outrageous behavior.  (Dkt. No. 47, Howard Decl. ¶ 8.)  Plaintiff further states he

27 has "severe emotional and financial distress." Id.

28      In the first amended complaint, Plaintiff alleges that the conduct of both Defendants was

1   extreme and outrageous.  (FAC ¶ 67.)  "A cause of action for intentional infliction of emotional

2   distress exists when there is (1) extreme and outrageous conduct by the defendant with the intention

3   of causing, or reckless disregard of the probability of causing, emotional distress; (2) the plaintiff's

4   suffering severe or extreme emotional distress; and (3) actual and proximate causation of the

5   emotional distress by the defendant's outrageous conduct."  Hughes v. Pair, 46 Cal. 4th 1035, 1050

6   (2009) (quoting Potter v. Firestone Tire & Rubber Co., 6 Cal. 4th 965, 1001 (1993)); see also

7   Christensen v. Superior Court, 54 Cal. 3d 868, 903 (1991).  "A defendant's conduct is 'outrageous'

8   [only] when it is so 'extreme as to exceed all bound of that [which is] usually tolerated in a civilized

9   community.'"  Hughes, 46 Cal. 4th at 1050–51 (quoting Potter, 6 Cal. 4th at 1001). A plaintiff may

10  recover for the intentional infliction of emotional distress if the defendant is aware of the presence of

11  the plaintiff, yet engages in outrageous conduct in reckless disregard to the probability that it will

12  cause the plaintiff severe emotional distress.  See Christensen, 54 Cal. 3d at 905.  "Severe emotional

13  distress means emotional distress of such substantial . . .  or enduring quality that no reasonable

14  [person] in civilized society should be expected to endure it."  Hughes, 46 Cal. 4th at 1051 (quoting

15  Potter, 6 Cal. 4th at 1004).

16      Defendants argue that Hibshman had probable cause to detain and cite Plaintiff.  In addition,

17  they argue Pazargadi was simply following protocol as provided for in the ordinance when he signed

18  a letter advising Plaintiff about his suspension.  Lastly, they assert that Plaintiff has not shown

19  severe emotional distress.

20      Plaintiff does not provide any substantive facts or arguments opposing the motion as to

21  Hibshman and provides no opposition to Pazargadi.  Consequently, Plaintiff has failed to show

22  there is a genuine issue of material fact whether Hibshman and Pazargadi's conduct was extreme

23  and outrageous.  Hibshman conduct of stopping Plaintiff the first time based on either his allegedly

24  invalid permit based on a mistake of the law or the fact that his permit could not be seen, does not

25  constitute extreme and outrageous behavior.  Plaintiff has also not shown that both Defendants had

26  the requisite intent or reckless disregard to cause emotional distress.  Accordingly, the Court

27  GRANTS Defendants' motion for summary judgment on the intentional infliction of emotional

28  distress claim.

[10cv2535-AJB(RBB)]

1    / / / /

2    **P.    Tenth Cause of Action - Negligent Infliction of Emotional Distress Against Defendants**

3        **Hibshman and Pazargadi**

4        Defendants assert that California will not allow the independent tort of negligent infliction of

5    emotional distress and California limits this cause of action to special relationships which does not

6    apply in this case.  Without providing any legal authority, Plaintiff argues that Hibshman had a

7    mandatory pre-existing duty to not arrest Plaintiff without a warrant or probable cause required by

8    the Fourth Amendment.  As to Pazargadi,  Plaintiff claims he had a duty not to suspend permits for

9    more than 30 days without a hearing pursuant to section 83.0128 of the San Diego Municipal Code.

10       In California, in order to state a prima facie case of negligent infliction of emotional distress,

11   plaintiff must plead "[t]he traditional elements of duty, breach of duty, causation and damages".

12   Fluharty v. Fluharty, 59 Cal. App. 4th 484, 490 (1997).  Where there is a "special relationship," such

13   that there is justified reliance by plaintiff on the defendant's statement or promise, a duty has been

14   found to exist.  Antique Arts Corp. v. City of Torrance, 39 Cal.  App. 3d 588, 593 (1974); see also

15   Morgan v. County of Yuba, 230 Cal. App. 2d 938 (1964) (deputy sheriff voluntarily promised to

16   warn decedent if defendant, who had made threats on her life, was released; defendant was released,

17   but sheriff did not warn and heirs had cause of action against county).  "A 'special relationship'

18   exists if and only if an injured person demonstrates the public officer 'assumed a duty toward [him]

19   greater than the duty owed to another member of the public.'"  Strong v. State, 201 Cal. App. 4th

20   1439, 1453 (2011) (citations omitted).  "A special relationship has been found to arise when a public

21   employee expressly or impliedly promises to undertake a special duty on a plaintiff's behalf . . . or

22   when a public employee causes an injured and dependent person to rely on the public employee to

23   his detriment.  Id.

24       Defendants argue that there is no duty between Defendants and Plaintiff.  In opposition,

25   Plaintiff summarily asserts, without any legal or factual support, that there is a pre-existing duty by

26   both Hibshman and Pazargadi owed to Plaintiff.  Plaintiff has not shown there is a genuine issue of

27   material fact as to whether there was a duty owed by Defendants Hibshman and Pazargadi to

28   Plaintiff.  Accordingly, the Court GRANTS Defendants' motion for summary judgment on the

1  negligent infliction of emotional distress claim.

2  **Conclusion**

3  Based on the above, the Court GRANTS in part and DENIES in part Defendants'

4  motion for summary judgment.  Specifically, the Court:

5       1.     GRANTS Defendants' motion for summary judgment as to the First Cause of Action

6              only as to procedural due process;

7       2.     GRANTS Defendants' motion for summary judgment as to the Second Cause of

8              Action for conspiracy only as to procedural due process;

9       3.     GRANTS in part and DENIES in part Defendants' motion for summary judgment as

10              to the Third Cause of Action for false imprisonment;

11       4.     GRANTS Defendants' motion for summary judgment as to the Fourth Cause of

12              Action for racial discrimination;

13       5.     GRANTS Defendants' motion for summary judgment as to the Fifth Cause of Action

14              for Slander;

15       6.     DENIES Defendants' motion for summary judgment as to the Sixth and Seventh

16              Cause of Action for violations of Cal. Civ. Code section 52.1;

17       7.     GRANTS Defendants' motion for summary judgment as to the Eighth Cause of

18              Action for Malicious Prosecution;

19       8.     GRANTS Defendants' motion for summary judgment as to the Ninth Cause of

20              Action for Intentional Infliction of Emotional Distress; and

21       9.     GRANTS Defendants' motion for summary judgment as to the Tenth Cause of

22              Action for Negligent Infliction of Emotional Distress.

23  Based on the Court's schedule, the pretrial conference set for July 13, 2012 is vacated and

24  continued to **August 3, 2012 at 1:30 p.m.**

25  IT IS SO ORDERED.

26

27  DATED:  June 29, 2012

28                                     _____
                                   Hon. Anthony J. Battaglia

    [10cv2535-AJB(RBB)]

U.S. District Judge

[10cv2535-AJB(RBB)]